[Cite as *In re D.H.*, 2026-Ohio-2182.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE D.H., ET AL.                              :

                                                            No. 115510

Minor Children                              :

[Appeal by Father, N.D.]                 :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 11, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. FA20704184 and FA20704185

---

### *Appearances:*

Bartos & Company, LPA, and Timothy G. Spackman, *for appellant*.

Michele A. Kalapos, *for appellee*.

MICHAEL JOHN RYAN, J.:

{¶ 1} Appellant-Father appeals the juvenile court's denial of his motion for shared parenting. Finding no merit to the appeal, we affirm.

{¶ 2} In April 2020, Father filed a complaint to establish paternity of the minor children, twins D.H. and K.H., who were born in May 2018. On November 29, 2021, the parent-child relationship was established. A subsequent hearing was

held before a magistrate to address the issue of the children's surname. The magistrate denied Father's request to change the surname of the minor children to his surname. Father appealed but his appeal was sua sponte dismissed by this court. *See In the Matter of: K.H., et al.*, No. 111478 (8th Dist. June 21, 2022).

{¶ 3} Father then moved for shared parenting. Appellee-Mother filed a motion to establish child support. The juvenile court appointed a guardian ad litem ("GAL") for the children and ordered the parties to be evaluated by the court's diagnostic clinic. The parties were unable to complete an evaluation with the clinic, however, because Father had a criminal matter pending.

{¶ 4} Mother moved for full psychological evaluations, requesting an order referring the parties to Dr. Deborah Koricke ("Dr. Koricke"), which the court granted. Father, however, was noncompliant because he refused to sign releases for his medical records.

{¶ 5} The matter proceeded to trial over three days in March 2025.

{¶ 6} Father, who was proceeding pro se, testified that he and Mother lived together but she moved out when she was pregnant. Father did not see the children for the first several months after they were born. When the children were about six months, Father had overnight visitation and would visit them several times a week at Mother's house. At some point, Mother unilaterally ended visitation.

{¶ 7} Father lived with his mother ("paternal grandmother"), stepfather, and two nieces. He testified he was last employed at a dog kennel but only worked there for a week because of an infection in his finger. Prior to that, he was employed at

Fresh Start Marketing Solutions but was laid off in March 2020 because of the COVID-19 pandemic. He then received unemployment benefits for "about a year." (Tr. 148.) Father owned a truck that he secured through a high-interest loan, received SNAP benefits, and was on Medicaid.

{¶ 8} Father testified that he could not work because of several knee surgeries, an amputated finger, and an undiagnosed heart condition. To support his claim, Father provided an unauthenticated letter from a healthcare provider, dated September 14, 2022, that detailed his work restrictions.[1] Father admitted to drinking heavily when depressed. He further admitted that his mother once tried to evict him. When questioned about the numerous times police had been called to his mother's home, Father claimed not to remember most of the incidents, including a physical altercation with his stepfather and a call his mother made because he had "freak[ed] out" after having drug issues. (Tr. 175.) Father claimed he could not remember a recent occurrence where he was transported to the hospital by ambulance because of a mental-health episode. According to Father, he did not have any mental-health diagnoses, although he had been hospitalized on more than one occasion for his mental health and suicidal ideations.

{¶ 9} According to Father, the reason he did not see the children from late 2018 until 2024 was because Mother would not allow it. He had two supervised visits in 2024, but the visits were terminated because he violated the visitation

---

[1] Even though the letter was unauthenticated, Mother did not object to its admission into evidence.

center's rules. Thus, Father had only seen the children twice since they were about six months old.

{¶ 10} On cross-examination, when asked why he refused to cooperate with Dr. Koricke, Father stated that he had a right to privacy to his medical records.

{¶ 11} Mother testified that she moved out of the house she shared with Father a month after she found out she was pregnant because she feared for her safety. Although the children were born in May 2018, Father did not meet them until September 2018. According to Mother, she initially wanted the children to have a relationship with their father, so she allowed visits. Contrary to Father's testimony, Mother stated he had the children only once overnight and it did not go well. After that visit, Mother told Father she was uncomfortable with him having the children overnight. Father got upset and refused to leave Mother's house; Mother had to call the police. After that, according to Mother, Father started "stalking and harassing" her, calling and texting her "hundreds of times a day," driving past her house, and sitting in his car in front of her house.

{¶ 12} Dr. Koricke testified that she is a clinical and forensic psychologist and owner of the Center for Effective Living. Dr. Koricke was referred to the family in 2023. Dr. Koricke testified that Father was initially cooperative and submitted to psychological testing. At his second visit, Father refused to sign any releases so that Dr. Koricke could obtain his medical and psychological records, which she needed to complete the evaluation. Dr. Koricke stated that she asked Father to make an appointment to discuss the records from his two supervised visits, but he never did.

{¶ 13} Dr. Koricke reviewed the records from the two supervised visits, which occurred in September and October 2024. Dr. Koricke noted that supervised visitation was terminated after the second visit because of Father's failure to follow the visitation center's rules. Dr. Koricke also reviewed relevant police reports. She noted the numerous reports that involved Father, including several times when Father was taken to the hospital for mental-health issues.

{¶ 14} Dr. Koricke concluded that because she had limited information from Father and because he had not seen the children in many years, the only recommendation she could make was that if the court decided Father should have visitation that it be supervised and take place "in a very secure setting."

{¶ 15} Paternal grandmother testified that she filed to evict her son in 2023 because of property damage, disorderly conduct, and smoking, but she did not pursue the eviction. She admitted she had previously called the police on her son but could not remember specifics or how many times she had called. When counsel tried to refresh her memory with the police reports, grandmother either insisted she did not remember any of the occurrences or downplayed their severity.

{¶ 16} The GAL told the court that he thought that shared parenting was not in the children's best interest and recommended Father have supervised visitation.

{¶ 17} The juvenile court subsequently denied Father's motion for shared parenting, ordered Father pay child support in the amount of $256.68 per month per child plus cash medical support in the amount of $21.07 per month for a total of

$283.31 per month per child plus a 2 percent processing fee. The court further granted Father supervised visitation.

{¶ 18} Father raises six assignments of error for our review:

I. The trial court erred and abused its discretion to appellant's prejudice in its denial of the appellant's application for shared parenting time which decision was based upon reports contained from the Geauga County Sheriff's and Fire Departments which were inadmissible hearsay.

II. The trial court erred and abused its discretion to appellant's prejudice in failing to consider R.C. 3109.051(A) and the factors under R.C. 3109.051(D) in ordering supervised parenting time for the appellant.

III. The trial court erred and abused its discretion in ordering current child support by finding appellant voluntarily unemployed or underemployed, imputing income based upon averaging three prior years of income, in using incorrect income figures for the appellant, where the evidence showed he was receiving public assistance and the trial court incorrectly imputed an arbitrary figure for his income.

IV. The trial court abused its discretion in its calculation of the plaintiff's past care obligation to defendant by making the current child support obligation retroactive to December 7, 2021, in derogation of R.C. 3119.05(K).

V. The trial court erred and abused its discretion in issuing child support orders in this case where it failed to join the Cuyahoga County Department of Job and Family Services, Office of Child Support Services as a necessary party defendant.

VI. The trial court erred when it approved the magistrate's decision by judgment entry filed April 28, 2022, which denied appellant's motion for a change in the children's surname as it lacked jurisdiction to do so as this case was on appeal in the Eighth District Court of Appeals.

**Court Committed Harmless Error in Allowing Paternal Grandmother to Testify Regarding Police Reports**

{¶ 19} In his first assignment of error, Father argues that the juvenile court abused its discretion in denying his motion for shared parenting time based upon reports from the Geauga County Sheriff's and Fire Departments ("police reports") because they were inadmissible hearsay. The juvenile court stated that it was allowing the reports into evidence because they related to paternal grandmother's testimony; the reports were used in an attempt to refresh paternal grandmother's recollection as to events that allegedly occurred involving Father.

{¶ 20} Evid.R. 801(C) defines hearsay evidence to include "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the matter asserted." Evid.R. 802 provides that hearsay evidence is not admissible unless otherwise provided by constitutional provision, statute, or a rule prescribed by the Supreme Court of Ohio.

{¶ 21} "[G]enerally, a police report constitutes inadmissible hearsay unless it meets one of the exceptions enumerated in the Rules of Evidence." *In re P.S.*, 2026-Ohio-403, ¶ 76 (8th Dist.), citing *Amoako-Okyere v. United Methodist Church*, 2015-Ohio-3841 (10th Dist.). Mother contends the police reports were admissible but does not offer any applicable exception to the hearsay rule in her brief on appeal.

{¶ 22} Evid.R. 612 governs using a writing to refresh a witness's memory and provides, in part: "If a witness uses a writing to refresh memory for the purpose of testifying, either: (1) while testifying; or (2) before testifying, if the court in its

discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing."

{¶ 23} When a witness lacks a present recollection of relevant events, a party may use a writing to refresh the witness's recollection. *State v. Kelly*, 2024-Ohio-1612, ¶ 56 (2d Dist.). "To accomplish this, 'the witness looks at the memorandum to refresh his [or her] memory of the events but then proceeds to testify upon the basis of his [or her] present independent knowledge.'" *Kelly* at *id.*, quoting *State v. Scott*, 31 Ohio St.2d 1, 5-6 (1972). Importantly, "'[t]he testimony of the witness whose recollection has been refreshed is the evidence, not the contents of the writing.'" *Kelly* at *id.*, quoting *State v. Powell*, 2012-Ohio-2577, ¶ 57. The writing used to refresh a witness's recollection is merely "'a memory jogging device.'" *Kelly* at *id.*, citing *State v. Turner*, 2019-Ohio-144, ¶ 28 (2d Dist.).

{¶ 24} Here, the trial court allowed counsel for Mother to question paternal grandmother about Mother's exhibit B, which contained numerous police reports and a Geauga County Sheriff's Involvement Summary. The summary lists over 100 times there was police involvement with Father from 2012 – 2025. Paternal grandmother was not questioned about the summary. She was, however, questioned extensively about the police reports.

{¶ 25} Counsel for Mother questioned paternal grandmother about the following police reports: G18-07113, dated May 19, 2018; G18-07266 dated May 21, 2018; G18-07332 dated May 23, 2018; G20-14249 dated October 24, 2020; G-21-06135 dated April 24, 2021; G22-17683 dated October 23, 2022; G22-19245 dated

November 20, 2022; G24-06907 dated April 22, 2024; and G24-07083 and G24-07055 both dated April 23, 2024.[2] As to each, paternal grandmother testified that the reports did not refresh her memory. Nonetheless, the court allowed, and at times ordered, paternal grandmother to read the narrative, or parts of the narrative, of each report into the record, including statements by the investigating officers and statements made to police by other people.

{¶ 26} "[D]eclarations in a police report that do not stem from firsthand observations are not admissible." *In re P.S.*, 2026-Ohio-403, at ¶ 80 (8th Dist.), citing *Wicks v. Lover's Lane Market*, 2022-Ohio-2652 (9th Dist.). Further, "'Police reports admitted to prove the truth of the allegations they contain are inadmissible hearsay.'" *In re P.S.* at *id.*, quoting *Wicks* at ¶ 13.

{¶ 27} Evid.R. 612 "allows an attorney to show (not read) a writing to the witness and allows the witness to read it silently to refresh his or her memory. If refreshed, the witness then testifies using present independent knowledge." *Dellenbach v. Robinson*, 95 Ohio App.3d 358, 368 (10th Dist. 1993), citing *State v. Scott*, 31 Ohio St.2d 1 (1972). If a witness's memory is not refreshed, the inquiry is completed, and "the jury cannot be informed of the nature of the writing, nor its contents." *Dellenbach* at *id.*

{¶ 28} Once paternal grandmother stated that the police report did not refresh her recollection, any questioning about the police report should have ceased

---

[2] Also included in exhibit B was a police report dated December 24, 2024, but paternal grandmother was not questioned about that report.

and the court should have not allowed or ordered paternal grandmother to read the narrative from the reports into evidence. Accordingly, we find that the juvenile court erred in allowing paternal grandmother's testimony regarding the police reports.

{¶ 29} Our analysis does not end there, however. We consider whether the admission of the reports constituted harmless error.

{¶ 30} Father points to no evidence that the trial court considered the police reports in rendering its decision. The court had sufficient evidence to determine that it was not in the children's best interest to have shared parenting. Father's only involvement with his children since they were infants were two supervised visits but supervised visitation was terminated because Father did not follow the visitation center's rules. Father lived with his family, did not contribute to household expenses, and had mental-health issues that he was not forthcoming about to Dr. Koricke or in his testimony to the court. Moreover, the court had the written report and testimony of Dr. Koricke and the GAL's report and statements made to the court during trial; both recommended supervised visitation.

{¶ 31} We further note that this was a trial to the bench. In reviewing a bench trial, we presume that the trial court only considered relevant and competent evidence in reaching its decision. The trial court acts as a factfinder and "is presumed to be able to sort out the irrelevant and prejudicial evidence from that which was probative and admissible." *State v. Parker*, 2002-Ohio-2688, ¶ 20 (8th Dist.). "'The presumption may be overcome only by an affirmative showing to the contrary by the appellant.'" *T.D. v. Ullom*, 2026-Ohio-1009, ¶ 44 (5th Dist.),

quoting *State v. Mackey*, 2014-Ohio-2288, ¶ 8 (5th Dist.). We note that multiple witnesses, including Father, testified about the contents of the police reports; Father does not challenge their testimony.

{¶ 32} Moreover, we have reviewed the August 7, 2025 judgment entry denying the motion for shared parenting and note that it contains no mention of the police reports as a basis for the court's denying the motion.

{¶ 33} Therefore, considering the above, the first assignment of error is overruled.

## The Juvenile Court Considered All Applicable Factors in Ordering Supervised Parenting Time

{¶ 34} In the second assignment of error, Father argues that the juvenile court abused its discretion in failing to consider the factors set forth in R.C. 3109.051(A) and (D) in ordering supervised parenting time.

{¶ 35} The appellate court reviews a trial court's decision on a motion for shared parenting for an abuse of discretion. *In re Z.L.*, 2022-Ohio-1234, ¶ 27 (8th Dist.), citing *Ayers v. Ayers*, 2022-Ohio-403 (6th Dist.).

{¶ 36} When allocating parental rights and responsibilities, the juvenile court must consider the best interest of the children pursuant to R.C. 3109.04(B)(1), and in doing so must consider all relevant factors under R.C. 3109.04(F). *In re Z.L.* at *id.*, citing *Ayers*. Although a trial court is required to consider the R.C. 3109.04(F) factors, it is not required to make specific findings for each factor in its judgment entry. *In re Z.L.* at *id.*, citing *In re E.O.T.*, 2019-Ohio-352 (8th Dist.). The court

retains broad discretion in making a best-interest determination. *In re Z.L.* at *id.*, citing *In re E.O.T.*

{¶ 37} Father contends that the juvenile court erred in failing to issue findings of fact and conclusions of law. Father misreads the applicable statute. R.C. 3109.051(A) provides, in part, that the court

> shall make a just and reasonable order or decree permitting each parent who is not the residential parent to have parenting time with the child at the time and under the conditions that the court directs, *unless* the court determines that it would not be in the best interest of the child to permit that parent to have parenting time with the child and includes in the journal its findings of fact and conclusions of law.

(Emphasis added.)

{¶ 38} Thus, the juvenile court is only required to issue findings of fact and conclusions of law if it determines that parenting time with that parent is not in the child's best interest. Here, the court ordered supervised parenting time.

{¶ 39} Father also contends that the juvenile court failed to consider the best interest factors in R.C. 3109.051(D). However, the court's journal entry expressly lists the R.C. 3109.051(D) factors it considered. Moreover, Father never requested findings of fact and conclusions of law under Civ.R. 52. "'[W]hen a party does not request that the trial court make findings of fact and conclusions of law under Civ.R. 52, the reviewing court will presume that the trial court considered all the factors and all other relevant facts.'" *Yannitell v. Oaks*, 2008-Ohio-6271, ¶ 33 (4th Dist.), quoting *Fallang v. Fallang*, 109 Ohio App.3d 543, 549 (12th Dist. 1996).

{¶ 40} The second assignment of error is overruled.

**The Court Did Not Abuse its Discretion in its Child Support Determination**

{¶ 41} In the third and fourth assignments of error, Father argues that the juvenile court erred in its computation of child support and in ordering it be retroactively applied. Specifically, Father claims that the court erred in finding him voluntarily unemployed or underemployed, erred in imputing income based upon averaging three prior years of income, used incorrect income figures, and should not have made his obligation retroactive.

{¶ 42} We review a juvenile court's determination of child-support obligations for abuse of discretion. *V.C. v. O.C.*, 2022-Ohio-1506, ¶ 10 (8th Dist.). A trial court "abuses its discretion when it exercises its judgment in an unwarranted way with respect to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 43} The juvenile court found that Father had been employed for the two years prior to Mother's December 2021 motion to establish support. The court acknowledged that Father had been unemployed since a work injury that resulted in the amputation of a finger. The court noted that Father receives means-tested benefits, lives with his parents, and does not contribute to household expenses.

{¶ 44} The determinations of whether a parent is voluntarily unemployed or underemployed, as well as the amount of potential income to impute, must be based on the facts and circumstances of the particular case. *In re L.S.*, 2018-Ohio-5116, ¶ 54, citing *In re B.S.*, 2009-Ohio-4660 (9th Dist.).

{¶ 45} R.C. 3119.01(C)(18) defines "potential income" as "[i]mputed income that the court or agency determines the parent would have earned if fully employed as determined from the following criteria":

(i) The parent's prior employment experience;

(ii) The parent's education;

(iii) The parent's physical and mental disabilities, if any;

(iv) The availability of employment in the geographic area in which the parent resides;

(v) The prevailing wage and salary levels in the geographic area in which the parent resides;

(vi) The parent's special skills and training;

(vii) Whether there is evidence that the parent has the ability to earn the imputed income;

(viii) The age and special needs of the child for whom child support is being calculated under this section;

(ix) The parent's increased earning capacity because of experience;

(x) The parent's decreased earning capacity because of a felony conviction;

(xi) Any other relevant factor.

{¶ 46} Pursuant to R.C. 3119.01(C)(18), potential income may be imputed if the court determines that the party was either voluntarily unemployed or voluntarily underemployed. Here, the juvenile court found that Father was voluntarily unemployed or voluntarily underemployed and had he been fully employed he would be earning at least the wage of $37,448 per year.

{¶ 47} Father argues that his prior three years of income should be for 2019, when he earned $46,500; 2020, when he earned $12,900; and 2021, when he earned $12,500. Father's W-2s show that he earned $39,500 in 2018, $46,500 in 2019, and $12,900 in 2020. We note, however, that Father's W-2 for 2020 was for employment only through March. As to his 2021 earnings, Father provided a tax return for tax year 2021 but acknowledged that it did not accurately represent his income for that tax year, because he was not employed. Father testified that he believed he was required to file a tax return for the court and that the amount he indicated as his income, $12,500, was the amount he thought he was required to document.

{¶ 48} There was evidence in the record that Father was voluntarily unemployed. Father testified he was unable to work and provided an unauthenticated letter from a healthcare provider, dated September 14, 2022, that detailed his work restrictions. Father did not provide any recent documentation, however, to support his claim that he was unable to work, nor did Father provide any evidence that he received disability-related assistance or had otherwise been declared unable to work. Father testified that he had been previously employed at a marketing solutions firm and had a vehicle for transportation. Father was living with his family, did not financially contribute to the household, and had no limitation on his time prohibiting him from obtaining full-time employment. Although Father had physical limitations, there was no evidence that he was unemployable.

{¶ 49} The juvenile court correctly used Father's average income for the prior two years of actual employment (2019 and 2020) and did not abuse its discretion in extrapolating his 2020 income to determine how much he would have earned, if not for the loss of his employment because of the pandemic.

{¶ 50} Father also argues that the juvenile court abused its discretion in making Father's current child support obligation retroactive to December 7, 2021, the date mother filed for child support. From what we can glean from Father's brief on appeal, he argues that the trial court is not allowed to retroactively apply child support.

{¶ 51} R.C. 3119.05(K) states in relevant part:

When a court . . . requires a parent to pay an amount for that parent's failure to support a child for a period of time prior to the date the court modifies or issues a court child support order . . . the court . . . shall calculate that amount using the basic child support schedule, worksheets, and child support laws in effect, and the incomes of the parents as they existed, for that period of time.

{¶ 52} R.C. 3111.13(F)(2) states:

When a court determines whether to require a parent to pay an amount for that parent's failure to support a child prior to the date the court issues an order requiring that parent to pay an amount for the current support of that child, it shall consider all relevant factors, including, but not limited to, any monetary contribution either parent of the child made to the support of the child prior to the court issuing the order requiring the parent to pay an amount for the current support of the child.

{¶ 53} These statutes provide that a child-support order may be applied retroactively. Father makes no other argument regarding the retroactive application of the court's child-support order, but we note that the evidence showed that Father

had not previously paid child support or otherwise contributed financially to the children's care.

{¶ 54} Accordingly, the third and fourth assignments of error are overruled.

**The Juvenile Court Joined Proper Parties**

{¶ 55} In the fifth assignment of error, Father argues that the juvenile court erred in issuing the child-support orders without joining the Office of Child Support Services ("OCSS") as a party.

{¶ 56} A review of the docket shows that the OCSS, as well as the Child Support Enforcement Agency Prosecutor ("CSEA Prosecutor"), were added as case parties. Both were sent a service summons shortly after Father's complaint was filed. OCSS and the CSEA Prosecutor continued to be served with court orders regarding hearing dates up to and including the trial date.

{¶ 57} The fifth assignment of error is overruled.

**The Issue of the Children's Surname is Not Properly Before this Court**

{¶ 58} In the sixth assignment of error, Father argues that the juvenile court erred in denying his motion to change the children's surname because the court lacked jurisdiction to do so.

{¶ 59} On March 30, 2022, the magistrate assigned to the case denied Father's motion and ordered that the surname of the children would remain the same. On April 13, 2022, Father filed a notice of appeal challenging that decision. *See In the Matter of: K.H., et al.*, No. 111478 (8th Dist.). On May 4, 2022, this court sua sponte ordered Father to file an amended appeal because the original appeal

was from a magistrate's decision, which was not a final appealable order. This court also warned that failure to file an amended appeal would result in the dismissal of the appeal. On May 23, 2022, this court extended the date to June 6, 2022. Father failed to file an amended notice of appeal, and the case was sua sponte dismissed on June 21, 2022.

{¶ 60} Father failed to timely appeal the court's order denying his motion to change the children's surname. This court has consistently refused to address assignments of error from a final order that was not the subject of a timely notice of appeal when those assignments of error are raised as part of an otherwise timely appeal — an act known as "bootstrapping." *Issa v. Cleveland Metro. School Dist.*, 2025-Ohio-4848, ¶ 9 (8th Dist.), citing *Basit v. Chapman*, 2016-Ohio-4562 (8th Dist.). "Bootstrapping" is:

> "the utilization of a subsequent order to indirectly and untimely appeal a prior order (which was never directly appealed) [and] is procedurally anomalous and inconsistent with the appellate rules which contemplate a direct relationship between the order from which the appeal is taken and the error assigned as a result of that order. *See*, Appellate Rules 3(D), 4(A), 5 and 16(A)(3)."

*Issa* at *id.*, quoting *Winters v. Doe*, 1998 Ohio App. LEXIS 4221, *6 (8th Dist. Sept. 10, 1998); *see also In re A.P.*, 2026-Ohio-743 (8th Dist.).

{¶ 61} By appealing from the August 7, 2025 journal entry denying his motion for shared parenting, Father is attempting to bootstrap arguments that are time-barred. In other words, Father is attempting to utilize the instant appeal to improperly seek review of alleged errors that he failed to timely appeal. As a result,

we lack jurisdiction to consider the assigned error.  *See Issa* at ¶ 11, citing *Bukovec v. Keger*, 2024-Ohio-1162 (8th Dist.).

{¶ 62} The sixth assignment of error is overruled.

{¶ 63} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

MARY J. BOYLE, P.J., and
DEENA R. CALABRESE, J., CONCUR